From: 440 891 7529    Page: 1/21    Date: 8/23/2007 12:48:19 PM



# CLEVELAND STADIUM MARKETING

**CLEVELAND STADIUM
PRIVATE SUITE LICENSE AGREEMENT
FOUNDERS PROGRAM
$100,000 SUITE**

Contract Date: _____
Suite Number: 276

Licensee: Larry E. Rogers          Phone No. 216-736-8501
Contact Person: Larry E. Rogers    Fax No. 216-736-8504
Address: 1001 Lakeside Ave., Suite 1900  Account No. _____

**SUITE LOCATION AND TERM:**
Licensee's Suite will be determined by a lottery. Founders Club members agree to be bound by the results of such lottery, and understand that their obligations to make payments pursuant to this agreement are not conditional upon the results of such lottery. The approximate location of Founders Club Suite locations is marked on the Stadium Diagram, which is attached to this Agreement as Exhibit A. Licensee's Founders' Club Suite is licensed for 10 NFL Seasons.

**SUITE BENEFITS:**
Licensee benefits, including ticket availability, parking information, suite amenities, and Super Bowl opportunities are set forth on Exhibit B attached to this Agreement.

**INITIAL PAYMENT:**
To reserve the Suite, a deposit in the amount of $22,200 is required. Please sign this contract and attach a check for the deposit payable to Cleveland Stadium Marketing. Deliver the contract and the check on or before November 8, 1996, to:

> Cleveland Stadium Marketing Center
> One Erieview Plaza, Suite 100
> Cleveland, Ohio 44114-1782

**FUTURE PAYMENTS:**
The balance of $66,600 of the initial annual License Fee must be paid on or before January 31, 1997. Following determination by the NFL of the Owner of the Browns, Cleveland Stadium Marketing will assign this Private Suite License Agreement to the Owner. After such assignment, the Owner will notify Licensee of the address for making future payments. The annual License Fees and payment deadlines for each of the NFL Seasons covered by this Agreement are set forth on the Schedule attached to this Agreement as Exhibit C.

**TERMS AND CONDITIONS:**
Licensee acknowledges and agrees to be bound by this Private Suite License Agreement and the attached Terms and Conditions. In addition, Licensee agrees to observe all rules, regulations, and policies pertaining to use of the Suite and attendance at Stadium Events including any modification that may be adopted or administered by Cleveland Stadium Marketing or Owner from time to time.

CLEVELAND STADIUM MARKETING              LICENSEE:
By: _H. C. Howell, III_                  By: _[signature]_
    Harry C. Howell, III                     HARRY E. ROGERS
                                             (Print Name & Title)
Date  1/6/97                             Date 11-4-1996

We thank you for your Contract. You will receive a counter-signed copy for your records.

LD-PAC/JS/kmn /10/29/96/25746b

**EXHIBIT 1**



From: 440 891 7529    Page: 2/21    Date: 8/23/2007 12:48:21 PM

# EXHIBIT A

## $100,000 Founder

Selection of Suite location to be determined at the lottery.
Initials on this page will be required at the time of the lottery.



Suite 216
Licensor's Initials
____ Licensee's Initials

## EXHIBIT B

## FOUNDERS PROGRAM
## SUITE BENEFITS
## $100,000 Suite

Subject to the terms and conditions of the Agreement, Licensee shall be entitled to the following benefits:

1. **Football and Other Admission Tickets.** Subject to Licensee's payment for tickets under the attached Exhibit C, Licensee shall receive twenty (20) admission tickets (the "Minimum Number") for every pre-season and regular season Browns Game. Licensee shall have the option to purchase twenty (20) admission tickets for post-season Browns Games and up to twenty (20) admission tickets for any other Stadium Event. Licensee will also be entitled to purchase an additional four (4) Suite tickets for any Browns Game or other Stadium Event, or to obtain four (4) additional Suite Passes allowing other ticketholders access to Licensee's Suite for any Browns Game or non-NFL Stadium Event.

2. **Parking Passes/Valet Parking.** Owner shall provide Licensee at no additional cost, for each pre-season and Browns Game four (4) parking passes for non-valet parking in a preferred-parking stadium lot which is proposed to be built adjacent to the Stadium. In the event that no such preferred-parking lot is built, Owner shall provide Licensee, at no additional cost, valet parking for four (4) automobiles in a nearby surface lot. Valet parking will be available only on dates of Browns Games or other Stadium Events.

3. **Super Bowl Tickets.** Each year during the Term (including Super Bowls XXXI - XXXIII), Licensee shall have the option to purchase from the Owner at face value up to four (4) admission tickets to the Super Bowl.

4. **NFL Sunday Ticket.** At no additional cost, each Suite shall include in-Suite cable television service and, so long as it is available from the NFL, complimentary subscriptions to NFL Sunday Ticket.

5. **Complimentary Programs.** At no additional cost, Licensee shall receive twenty (20) complimentary programs for each Browns Game, including post-season games for which Licensee purchases admission tickets. Programs will be delivered to the Suite before kickoff.

6. **Business Use/Business Center.** Licensee shall have access to the Suite during regular business hours (8 a.m. to 6 p.m.) on weekdays that do not coincide with game days or other Stadium Events. No admission tickets shall be required for such access. By reserving with the Owner on a first-come-first-serve basis, Licensee also shall have access to an appropriately equipped conference room/business center in the Suite Level.

7. **Club Seat Tickets.** Licensee shall have the right, on a priority basis in reverse lottery order, to purchase up to eight (8) Club Seat tickets in locations to be determined as Club Seat locations are assigned, pursuant to a separate Club Seat License contract.

From: 440 891 7529        Page: 4/21      Date: 8/23/2007 12:48:21 PM

### EXHIBIT C

$100,000 Suite Founders Program
### LICENSE FEE AND TICKET PAYMENT SCHEDULE
(10 NFL Season License)

1.  **ANNUAL LICENSE FEE.** (a) The "License Fee" payable by Licensee to Owner in respect of each NFL Season during the Term is as set forth below unless Licensee elects the prepayment option set forth in subsection (b) below:

    $88,800 for the first (1st) NFL Season;
    $88,800 for the second (2nd) NFL Season;
    $88,800 for the third (3rd) NFL Season;
    $88,800 for the fourth (4th) NFL Season;
    $88,800 for the fifth (5th) NFL Season;
    $90,576 for the sixth (6th) NFL Season;
    $92,388 for the seventh (7th) NFL Season;
    $94,235 for the eighth (8th) NFL Season;
    $96,120 for the ninth (9th) NFL Season; and
    $98,042 for the tenth (10th) NFL Season.

    (b) At Licensee's option, Licensee may prepay all amounts due with regard to the Suite including the License Fee for the Term by the payment of $825,000 on or before January 31, 1997. If Licensee fully prepays the License Fee, then Licensee will not be obliged to pay any amount for tickets or a security deposit under Sections 2 or 3 below. Licensee ___ does _X_ does not elect to prepay the License Fee.

2.  **TICKETS.** For the initial NFL Season and thereafter, Licensee is obligated to pay Owner for the Minimum Number of pre-season and regular Browns Game tickets payable within thirty (30) days following notice by the Owner, but no earlier than the May 1st before each Season. The ticket price will be no less than the highest priced non-premium seat ticket, will change from Season to Season, and for the initial NFL Season will cost $11,200 for the Suite. Payment for optional purchases of tickets and post-Season Browns Games are due within thirty (30) days following notice by Owner.

3.  **SECURITY DEPOSIT.** If Licensee does not elect the prepayment option, the amount of $22,200 shall be paid to Owner as a "Security Deposit," payable within thirty (30) days following notice by Owner but no earlier than May 1, 1999, and refundable to Licensee only at the end of the License Agreement, in accordance with the terms of that Agreement.

4.  **LICENSE FEE PAYMENTS.** If Licensee does not elect the prepayment option, the License Fee for each of the second through tenth NFL Seasons shall be payable in full on or before the 1st day of May immediately prior to the beginning of such NFL Season, which shall include the following percentage increases: 2.0% annual escalator on initial License Fee for each of years 6-10, as set forth in Paragraph 1 above.

_____
Licensee Signature

From: 440 891 7529    Page: 5/21    Date: 8/23/2007 12:48:22 PM

**EXHIBIT D**

**SUITE FEATURES**

**STADIUM SUITE FEATURES.**

The Suite will contain and include the following features:

(a) Storage cabinets, including lockable cabinets;

(b) Private restroom;

(c) Wet bar with refrigerator;

(d) Three (3) color televisions, with remote controls;

(e) Individually-controlled air conditioning and heating;

(f) Coffee tables;

(g) Four (4) side chairs;

(h) Carpet, glass door to seating area, and coat closet with storage area;

(i) A telephone with internal access and external access, except that the installation and the cost of service for external access shall be at Licensee's option and expense;

(j) A locking drawer for PC storage and, at Licensee's option and expense, the installation and service for a data port; and

(k) Food and beverage bar with six (6) bar stools.

## EXHIBIT E

### COST-SHARING

1. <u>Cost-Sharing Arrangement</u>. Pursuant to Section 20 of this Agreement, there is _____ is not _X_ any existing Cost-Sharing Arrangement with respect to the Suite. If there are such arrangements the following information is hereby provided:

    Name, address and phone number of parties with whom such Cost-Sharing Arrangement exists:

Name _____
Address _____
_____
_____

Telephone _____

Designated
Representative
Name _____


Name _____
Address _____
_____
_____

Telephone _____

Designated
Representative
Name _____

All of such arrangements are subject to Section 20 of this Agreement.

## TERMS AND CONDITIONS

THIS DOCUMENT constitutes the "Terms and Conditions" referred to in, and incorporated into, the Private Suite License Agreement (the "Agreement") executed by the person or entity identified therein as "Licensee" and Cleveland Stadium Marketing ("CSM") to be assigned, upon designation by the National Football League ("NFL"), to the owner of the Cleveland Browns football club ("Owner"). Pursuant to the Agreement, Licensee has received a license and exclusive privilege and right to use the private suite identified in the Agreement (the "Suite") in the football stadium to be constructed at the downtown lakefront in Cleveland, Ohio (the "Stadium"). These Terms and Conditions shall be binding upon CSM, Owner and Licensee.

1. **GRANT OF LICENSE.** Upon payment of the License Fee set forth in the Agreement, Licensee shall be entitled to the exclusive privilege and right during the Term set forth below to use the Suite identified in the Agreement. This License is granted upon and subject to the provisions of this Agreement and the Terms and Conditions.

2. **PRIVATE SUITE.** The Suite is to be constructed as part of the Stadium and will be comprised of an open, covered, private deck with seats facing the playing field of the Stadium and a furnished, enclosed climate-controlled lounge area and a private restroom. The approximate location of the Suite is shown on the Stadium Diagram which is attached to the Agreement as Exhibit A. However, Licensee acknowledges that it is aware that the Stadium is yet to be built and that the actual location of the Suite may vary from that set forth in the Stadium Diagram.

3. **FURNISHINGS, DECOR AND ALTERATIONS.** The Suite shall be furnished and equipped with such fixtures, furnishings and equipment as Owner shall determine but will include the features set forth in Exhibit D. Licensee shall not make any additions or alterations in the interior or exterior of the Suite or the fixtures, furnishings and equipment therein without the prior written consent of the Owner. The Owner may withhold such consent for any reason whatsoever. Any changes, alterations or additions authorized by Owner will be made at Licensee's sole cost and expense, free of any liens, in a good and workmanlike manner, and in compliance with applicable permits, authorizations, building and zoning laws and all other laws and ordinances and other legal requirements that may apply. Any fixtures or materials incorporated in or attached to the Suite by Licensee shall become the property of Owner, unless Licensee has received the Owner's written consent or direction to remove them before the expiration of the Term, in which case Licensee shall, subject to normal wear and tear, restore the Suite to its original condition.

4. **ADMISSION TICKETS.** Licensee is obligated to pay for the Minimum Number of admission tickets to the Stadium for access to the Suite as set forth in the Agreement for each pre-season NFL game played by the Cleveland Browns at the Stadium ("Pre-season Games") and each regular season NFL game played by the Cleveland Browns at the Stadium ("Browns Games"). Licensee shall be entitled to purchase the required admission tickets to the Stadium for access to the Suite for any post-season NFL games for which Licensee desires to use the Suite. If the Licensee elects to purchase tickets for any post-season NFL games, Licensee must purchase no less than the Minimum Number of admission tickets for such game set forth in the Agreement.

Except as provided below, Licensee shall be entitled to purchase the required admission tickets in any amount up to the Minimum Number of tickets set forth in the Agreement for other games and non-NFL events at the Stadium ("Stadium Events") for which Licensee desires to use the Suite. Admission tickets for such Stadium Events shall be priced by the sponsor or promoter of the Stadium Event (an "Event Sponsor").

Notwithstanding the foregoing, if Licensee is a participant in the Founders Program, Owner shall arrange for Licensee to receive the Minimum Number of admission tickets set forth in the Agreement for up to four (4) Stadium Events selected by Licensee per each successive 12 month period during the Term.

In the event that the Suite is deemed to be obstructed or to contain non-manifest seats by the promoter of any event or game hosted in the Stadium, or in the event that the Event Sponsor of certain extraordinary events (e.g., Olympics, World Cup Soccer, NCAA Tournament) restricts the sale of tickets, Licensee shall not have the right to purchase admission tickets for the Suite.

Except as set forth in Section 17 below, Owner shall have no right to admit any person to the Suite during any post-season games or other Stadium Events for which Licensee does not purchase or receive admission tickets.

From: 440 891 7529    Page: 8/21    Date: 8/23/2007 12:48:22 PM

5.  **POSSESSION AND USE.** Licensee shall be entitled to the exclusive use and possession of the Suite during the Term (except as provided in Section 17 below), subject to the provisions of the Agreement. Licensee and Licensee's guests shall be entitled to use the Suite at all times for which appropriate tickets for admission to the Suite have been obtained. In addition, Licensee and Licensee's guests will have access to the Club Level facilities at the Stadium (other than facilities restricted for the exclusive use of the Owner or other Suite Licensees) (the "Club Facilities") in accordance with such procedures as shall be established by Owner. During dates on which Pre-season Games, Browns Games or other Stadium Events occur, access to the Suite and the Suite area, as well as the Club Facilities, shall be controlled by, and shall require the presentation by, each person using such area of a ticket for admission thereto. In addition to the access benefits described in Exhibit B, Section 6, Licensee shall be given access to the Suite on other dates upon such terms and conditions as Owner, in its discretion, may permit or designate. Licensee and Licensee's guests shall be bound by and shall observe the terms and conditions upon which tickets for admission to the Stadium have been issued by the Owner or by an Event Sponsor including, without limitation, the policy adopted by the issuer of such tickets with respect to the cancellation or postponement of the game or event.

Access to the Suite shall be from a separate Suite Level of the Stadium. Access to the Suite Level shall be shared only by persons holding appropriate tickets for admission to the Private Suites. The Suite shall be provided with a lock system.

The Agreement provides Licensee only with the right and privilege to possess and use the Suite in the manner set forth in the Agreement and, except as pertains to the special right and privilege to so possess and use the Suite, the Agreement does not confer upon Licensee and Licensee's guests any greater or lesser rights and privileges with respect to admission to the Stadium than afforded to other holders of tickets for admission thereto.

6.  **PARKING.** Licensee shall have the right to receive, at no additional cost or charge at all times during which Licensee is entitled to use the Suite under this Agreement, the number of parking passes set forth in the Agreement for parking in Stadium lots designated by Owner.

7.  **SERVICES.** Food and beverage services shall be provided by a caterer designated by Owner, at prevailing rates established by such caterer, to be billed directly to Licensee. Licensee shall pay on a timely basis all charges and expenses, including applicable taxes for catering and other services, incurred by Licensee in connection with the use of the Suite by the Licensee or the Licensee's guests. No food or beverages other than those purchased from such designated caterer or from the concessionaires in the Stadium may be brought into or be prepared or consumed in the Suite.

The Owner will be responsible for ordinary repairs and maintenance to the interior and exterior of the Suite (including ordinary cleaning, sweeping, vacuuming, trash removal, and dusting). The Owner reserves the right to charge Licensee for, and Licensee agrees to pay for, the cost of what Owner considers, in its sole and absolute discretion, to be extraordinary repairs, maintenance, replacements, or cleaning of the Suite resulting from any act or omission of Licensee.

8.  **SECURITY DEPOSIT.** As security for the prompt and full payment of all fees, including the License Fee, and Licensee's full and faithful performance of its obligations hereunder, Licensee will pay a security deposit in the amount set forth in the Agreement (the "Security Deposit"). After delivering the Security Deposit to the Owner, the Security Deposit may be commingled with other of Owner's funds and may be used by Owner for any business purpose. If Licensee complies with all terms and conditions of the Agreement, the Security Deposit will be refunded in accordance with this Section 8.

If, at any time during the Term, any portion of the License Fee or any other amount payable by Licensee to Owner is not promptly paid when due, Owner may, without prior notice and without waiving any other remedy which it may have under the Agreement, appropriate and apply all or any portion of the Security Deposit to the payment of such amount. Licensee shall, upon written demand of Owner, remit to Owner an amount sufficient to restore the Security Deposit to the original sum deposited. Licensee's failure to do so within five (5) business days after receipt of such demand shall constitute a breach of the Agreement.

If Licensee's right to use the Suite is terminated, Owner may, at its option, appropriate and apply the Security Deposit, or so much thereof as may be necessary, to compensate Owner for any loss or damage sustained or suffered by Owner due to Licensee's breach. Otherwise, the Security Deposit shall be returned to Licensee at the later of the expiration of the Term of the Agreement, or any renewal term, less any costs and expenses incurred by Owner as a result of Licensee's use of Suite or to enforce the provisions of the Agreement. No interest will be paid on the Security Deposit.

9. **OBLIGATION TO PAY.** Except as otherwise set forth herein, the obligation of Licensee to pay the Security Deposit, the License Fees, food and beverage concessions charges, or other sums due to CSM, Owner, Owner's concessionaires, or any Event Sponsor is independent of the liabilities or limitations of Owner under the Agreement. Licensee shall promptly make all such payments due without any deductions, set offs, or counterclaims against such payments on account of any breach or default by or claims against Owner or otherwise, or any breach or default by or claims against any concessionaire or any Event Sponsor. Licensee shall make all payments due to Owner's concessionaires or any Event Sponsor without any deductions, setoffs, or counterclaims against such payments on account of any breach or default by or claims against Owner. Nothing in this Section shall prevent Licensee from bringing an independent action against Owner or any concessionaire or Event Sponsor.

Owner shall not be liable for, and Licensee shall not assert any deduction, set off or claim of any nature against Owner for, any act or omission of or any breach or default by any concessionaire or Event Sponsor. Licensee shall be bound by the terms and conditions established from time to time by Owner or any Event Sponsor for cancellation or postponement of a game or event. Except as otherwise set forth in such terms and conditions, Owner shall have no liability to Licensee on account of any such cancellation or postponement or other failure or deficiency in the conduct of such event. The Event Sponsor shall have no liability on account thereof except as otherwise provided on the tickets issued to Licensee.

Licensee's rights under the Agreement, including the rights to have access to and use the Suite and the Club Facilities and to obtain admission to the Stadium or the Suite, are subject to the conditions precedent of payment by Licensee to Owner of all sums then due Owner and upon Licensee's continued compliance with the Agreement.

Annual License Fees for the Suite will be billed to Licensee and will be due and payable at the times set forth in Exhibit C to the Agreement. In addition, Licensee shall pay any sales, privilege, rental, use, property or other governmental taxes due on, or with respect to, the Annual License Fees or on account of the use of the Suite or the Club Facilities.

10. **FAILURE TO CONSTRUCT STADIUM OR DESIGNATE OWNER.** Construction of the Stadium is the responsibility of the City of Cleveland, and designation of the Owner is the responsibility of the NFL. Accordingly, CSM expects, but makes no guarantee, that construction of the Stadium will be completed and that an Owner will be designated so that Browns Games will commence in the 1999 NFL Season.

If for any reason construction of the Stadium is not completed or the Suite is not included in the Stadium or the NFL does not designate an Owner, CSM shall promptly return the initial Annual License Fee to Licensee. Upon return of the initial Annual License Fee to Licensee, the Agreement will terminate and the parties will have no further liability or obligation to each other. Neither CSM nor Owner shall have any obligation to refund the initial Annual License Fee in the event that (a) completion of the Stadium or the Suite is delayed or (b) the location of the Suite materially varies from that set forth in the Agreement.

During the Term of the Agreement, the Stadium may be improved, altered, expanded, or enlarged.

11. **TERM OF AGREEMENT.** The term of the Agreement (the "Term") will be for the period beginning on the date of full execution of the Agreement and will continue for the number of full NFL football seasons set forth in the Agreement, beginning with the first season during which Browns Games are played at the Stadium (each NFL season being herein referred to as an "NFL Season"). The Term will end immediately after the last regular season or post-season championship football game played by the Cleveland Browns at the Stadium during the last NFL Season within the Term. It is expected that the Stadium will be completed by the 1999 NFL Season. However, Licensee understands that it is possible that the Stadium will not be completed by such time. In the event that the construction of the Stadium is not completed in time to enable the Cleveland Browns to play all of its home games in the Stadium during the first NFL Season of the Term, the License Fee payable under the Agreement for the first NFL Season shall be reduced to an amount equal to the product of (a) the total License Fee payable for the first NFL Season, multiplied by (b) a fraction, the numerator of which is the number of Browns Games played in the Stadium during the first NFL Season, and the denominator of which is the total number of Browns Games originally scheduled to be played by the Cleveland Browns during the first NFL Season. The amount of such reduction shall be credited by Owner against the License Fee payable by Licensee in respect of the last NFL Season during the Term. There shall be no reduction for Pre-season Games not played in the Stadium due to construction delays. If during the first NFL Season the Cleveland Browns play home games (either regular or pre-season) at a venue other than the Stadium ("Temporary Venue Games"), Owner shall offer to sell to Licensee tickets for Temporary Venue Games at least thirty (30) days prior to commencing any sale of such tickets to the general public. The prices of, and terms and conditions with respect to, tickets for Temporary Venue Games shall be determined by Owner. Other than to provide Licensee with a credit and advance purchase opportunity as provided above, Owner shall have no liability to Licensee under the Agreement for any delays in the completion of the Stadium.

From: 440 891 7529    Page: 10/21    Date: 8/23/2007 12:48:23 PM

 

12. **LATE FEE.** Any License Fee or other monetary obligation under the Agreement not paid to Owner by the date specified in the Agreement shall bear interest accruing from such date at the rate of fifteen percent (15%) per annum or the highest rate permitted by law, whichever is less.

13. **RIGHT OF FIRST REFUSAL.** If not in default in the performance of Licensee's obligations under the Agreement, Licensee shall have the right of first refusal to renew this License after the expiration of the Term at such license fee and on such other terms and conditions as Owner may, in its sole discretion, determine. Owner shall submit to the Licensee an agreement which sets forth the license fee and other terms and conditions established by Owner for the renewal license. Licensee may exercise, if at all, its right of first refusal by executing and returning such agreement to Owner, together with any deposit or other payment which may be required thereunder, within thirty (30) days after the agreement is sent to Licensee by Owner.

14. **COVENANTS OF LICENSEE.** Licensee covenants and agrees with Owner as follows:

(a) Licensee shall keep and maintain the Suite in good repair, order and condition at all times. Except for ordinary wear and tear, Licensee will reimburse the Owner for the repair of any damage caused to the Suite or the Owner's property in the Suite by Licensee or any of Licensee's guests or invitees.

(b) Licensee shall abide by, and shall notify and require its guests to abide by, such rules and regulations as Owner shall establish from time to time concerning the use and occupancy of the Suite.

(c) Licensee and Licensee's guests shall at all times maintain proper decorum while using the Suite. Licensee shall be held responsible for its actions as well as those of its guests including, but not limited to, actions arising from the consumption of alcoholic beverages. Should Licensee or any of Licensee's guests create a disturbance or cause objects to be thrown or dropped from the Suite, the Owner shall have the right to eject the parties responsible for such action, or all the persons in the Suite, from the confines of the Stadium, or exercise any of the Owner's rights upon default in accordance with the provisions of Section 15 of these Terms and Conditions including, without limitation, termination of the Agreement. Licensee and Licensee's guests shall comply with all applicable present and future laws, ordinances, orders, rules and regulations and shall not permit any violation thereof.

15. **DEFAULT.** In the event Licensee fails to pay when due any amounts to be paid by Licensee pursuant to the Agreement (including, without limitation, the License Fee) or otherwise defaults in the performance or observation of its duties and obligations under the Agreement, Owner may, at its option: (a) withhold distribution of tickets to Licensee for games and events played in or held at the Stadium until such time as such default is cured; and/or (b) terminate the rights of Licensee under the Agreement after giving Licensee not less than twenty (20) days prior written notice of such default or breach. In the event that Licensee shall not have cured the default or breach specified in said notice by the date specified in said notice, Owner may terminate the right of Licensee to the use and possession of the Suite and all other rights and privileges of Licensee under the Agreement and declare the entire unpaid balance of the License Fee (which for purposes hereof shall include the total aggregate unpaid balance of the annual License Fees for the remainder of the Term) immediately due and payable, whereupon Owner shall have no further obligation of any kind to Licensee. Owner shall use reasonable efforts to relicense the right to the use and possession of the Suite to another party provided that, if there are any other suites in the Stadium available to be licensed, Owner may give priority to licensing such other suites. Licensee shall remain obligated to make all payments due or becoming due under the Agreement, but if Owner licenses the right to the use and possession of the Suite to another party, then all amounts received from such other party, applicable to any remaining period of the Agreement, shall be applied first to the expense of relicensing and then to the reduction of any obligations of Licensee to Owner under the Agreement. If the consideration collected by Owner upon any such relicensing is not sufficient to pay the full amount of all such obligations of Licensee, Licensee shall pay such deficiency upon demand.

The foregoing remedies of Owner shall not be to the exclusion of any other right or remedy set forth in the Agreement or otherwise available to Owner in law or in equity. Licensee shall be responsible for all attorneys' fees and costs incurred by Owner in the enforcement of the Agreement whether or not litigation is actually commenced and including any appellate proceedings. LICENSEE HEREBY WAIVES TRIAL BY JURY.

No waiver by Owner of any default or breach by Licensee of its obligations under the Agreement shall be construed to be a waiver or release of any other subsequent default or breach by Licensee under the Agreement, and no failure or delay by Owner in the exercise of any remedy provided for in the Agreement shall be construed a forfeiture or waiver thereof or of any other right or remedy available to Owner.


16.     **STRIKES, DAMAGES, DESTRUCTION, ETC.** In the event of (a) any strike or other labor disturbance which results in the cancellation of any Browns Game at the Stadium or (b) any damage to or destruction of the Suite or the Stadium which renders the Suite or the Stadium unusable, then, in either of said events, the License Fee payable under the Agreement shall, unless a reasonably comparable suite is made available to the Licensee, be abated during the period of time that the Suite is unusable. Any such abatement of the License Fee shall be computed for each NFL Season by dividing the number of Browns Games for which the Suite was unusable by the total number of Browns Games originally scheduled to be played in the Stadium during the applicable NFL Season including the number of NFL games which were canceled as a result of any such strike, labor disturbance, damage or destruction. Any such abatement shall be offset against the next succeeding installment of the License Fee payable by Licensee. There shall be no abatement for canceled Pre-season Games or unavailability of the Suite or Stadium for Pre-season Games. If, in the event of any damage to or destruction of the Suite or the Stadium, the Owner elects not to repair or restore the same, the Agreement shall terminate as of the date of such damage or destruction, and the entire amount of the abatement promptly shall be paid to Licensee. Upon payment of such abatement, the Owner shall have no further liability under the Agreement. The License Fee shall not be abated if the untenancy of the Suite was caused by the fault or neglect of the Licensee or Licensee's guests.

17.     **ACCESS BY OWNER.** Owner and its agents and employees shall have access to the Suite to the extent deemed necessary by Owner (a) for the performance of its obligations under the Agreement and for any and all purposes related thereto, (b) to investigate any suspected violations of the terms and conditions of the Agreement, or (c) otherwise in connection with the ownership of the Suite. Licensee shall not interfere with Owner's right of access by installation of additional or changed locks or otherwise.

18.     **DISCLAIMER OF LIABILITY.** None of CSM, Owner, the City of Cleveland, or any stadium manager designated by Owner (the "Stadium Manager") or any of their officers, employees or agents shall be liable or responsible for any loss, damage, or injury to any person or to any property of Licensee or Licensee's guests in or upon the Stadium, resulting from any cause whatsoever including, but not limited to, theft and vandalism, unless due to the gross negligence or the willful misconduct of CSM, Owner, the City of Cleveland, or the Stadium Manager, respectively.

In addition, Licensee agrees to indemnify and hold CSM, Owner, the City of Cleveland, and the Stadium Manager harmless from and against any liability, losses, claims, demands, costs and expenses, including attorneys' fees and litigation expenses, arising out of any personal injury, or property damage occurring in or upon the Stadium in connection with Licensee's use or occupancy of the Suite or due to any contravention of the provisions of the Agreement or of any applicable laws, rules, regulations or order of any governmental agency having appropriate jurisdiction over any actions or negligence of Licensee.

In addition, Licensee shall, at its sole cost and expense, obtain and keep in full force and effect at all times during the Term, a comprehensive general liability insurance policy (including, without limitation, host liquor liability coverage) with a single limit of at least Five Million Dollars ($5,000,000.00), including coverage for bodily injury or death, property damage, and personal injury liability and for the performance by Licensee of the indemnity provisions of the Agreement. The limits of this insurance shall not, however, limit the liability of Licensee under the Agreement. Prior to Licensee's occupancy of the Suite and before the insurance policy shall expire, Licensee shall deliver to Owner a certificate evidencing the issuance of such insurance policy. Licensee's comprehensive general liability insurance policy and certificate evidencing such insurance shall (i) name the Owner and the City of Cleveland as additional insureds, (ii) contain a provision by which the insurer agrees that the policy shall not be canceled except after thirty (30) days written notice to Owner and the City of Cleveland, and (iii) be issued by insurance companies reasonably satisfactory to Owner and qualified to do business in the State of Ohio. Any liability insurance carried or to be carried by Licensee under the Agreement shall be primary over any policy carried by Owner or the City of Cleveland. If Licensee shall fail to obtain or maintain the required insurance, Owner may, at its option, obtain the insurance on Licensee's behalf, using its best efforts to obtain such insurance at a reasonably competitive rate, and the cost of such insurance shall be immediately due and payable by Licensee upon demand of Owner.

19.     **MISCELLANEOUS.**

(a)     Upon the expiration of the Term (or, if applicable, upon the expiration of any renewal term pursuant to Licensee's right of first refusal under Section 13 hereof) or upon the earlier termination of the Agreement, Licensee shall surrender possession of the Suite to Owner in the condition in which it was originally delivered to Licensee, except for the normal wear and tear, and damage caused by casualty or force beyond the control of Licensee or Licensee's guests.

(b) Licensee shall not cost-share, co-license, sell, assign, sublease, pledge or otherwise transfer or encumber the Agreement, or any of Licensee's rights and obligations under the Agreement, without the prior written consent of Owner, except as set forth in Sections 20 and 21. Any attempted sale, assignment, sublease, pledge, transfer or encumbrance in contravention of the foregoing shall be null and void and of no effect.

(c) It is understood that Owner may mortgage, pledge, assign or otherwise encumber Owner's rights in the Agreement as security for financing facilities operated by Owner in the Stadium, to any successor owner of the Cleveland Browns football club, or for other purposes of Owner, and that, in such event, the Agreement and the rights and interests of Licensee hereunder shall be subordinate thereto; provided that any such mortgagee, pledge, assignee or the holder of any such lien shall agree in writing to recognize the Agreement and the rights and interests of Licensee hereunder in the event of foreclosure or enforcement of said lien if Licensee is not then in default in the performance of Licensee's obligations under the Agreement.

(d) All notices, demands and other communications between the parties required or appropriate hereunder shall be in writing and deemed given if mailed, postage prepaid, to the respective addresses set forth in the Agreement, or to such other address as may be designated by either party, from time to time, in writing.

(e) THE AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO, WITHOUT REGARD TO ANY OTHERWISE APPLICABLE PRINCIPLES OF CONFLICT OF LAWS.

(f) The Agreement, together with these Terms and Conditions and the Exhibits and Schedules annexed thereto and hereto, contains the entire agreement of the parties with respect to the matters provided for therein, and shall supersede any written instrument or oral agreement previously made or entered into by the parties to the Agreement.

(g) The Agreement, and all the terms and provision thereof, shall inure to the benefit of and be binding upon the parties thereto, and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns. No amendment or modification to the Agreement shall be effective unless the same is in writing and signed by both Owner and Licensee.

20.     COST-SHARING ARRANGEMENTS. Licensee hereby covenants, represents and warrants that, except with respect to the parties disclosed on Exhibit E attached to and made a part of this Agreement, Licensee has not entered into, nor will it enter into, any agreements or arrangements by which Licensee and any other party or parties share the costs attributable to the Suite including, but not limited to, the License Fees provided for hereunder, in consideration for the use of the Suite during the Term hereof ("Cost-Sharing Arrangement"). A Cost-Sharing Arrangement shall include any and all agreements to transfer, for any consideration whatsoever, one or more Suite tickets. In the event that Exhibit E discloses any parties with whom Licensee has entered into a Cost-Sharing Arrangement, Owner has approved such arrangements by its execution of this Agreement. In no event shall Owner's approval of these parties imply approval by Owner of any other parties. No Cost-Sharing Arrangement shall relieve Licensee from being fully liable for all obligations under this Agreement, including all License Fees. Owner shall have the right, exercisable in Owner's sole and absolute discretion, to prohibit and to reject any proposed Cost-Sharing Arrangement or to limit the number of parties to a Cost-Sharing Arrangement, both upon execution hereof and at any time thereafter. Licensee hereby represents and warrants that all amounts payable by the other parties to any Cost-Sharing Arrangement do not exceed the License Fees and other costs imposed on Licensee hereunder for the use of the Suite reasonably allocable to the use of the Suite by the other parties to the Cost-Sharing Arrangement. In the event that Licensee desires to enter into a Cost-Sharing Arrangement after execution of this Agreement, Licensee shall be required with respect thereto to provide to Owner the identity of the party(s) to the proposed Cost-Sharing Arrangement, and the address and phone number of such party(s), so that Owner may contact them to provide such financial or other information as Owner shall deem advisable. All such future Cost-Sharing Arrangements shall be subject to the same conditions and restrictions as a Cost-Sharing Arrangement disclosed herein. Transfer of Suite tickets for the appropriate allocable cost pursuant to an approved Cost-Sharing Arrangement shall not violate Section 11 of the Agreement.

21.     ASSIGNMENT; WHEN PERMITTED.

21.1    Assignment Licensee hereby acknowledges that the identity of Premium Seating licensees is of crucial importance to Owner. Accordingly, Licensee hereby agrees that, unless Licensee has obtained Owner's consent as provided in Section 21.2 hereof, it shall not assign, sell, sublicense, transfer, mortgage or otherwise alienate or encumber (any such act being to "assign" and to result in an "assignment") this Agreement or any interest herein; provided, however, that Licensee may distribute Tickets or passes for use of the Parking Spaces to its guests and invitees for use in the manner permitted herein. For purposes hereof, a transfer of a controlling interest in the capital stock or partnership interests of Licensee or a merger or consolidation of Licensee with another

-6-

entity shall be deemed to be an assignment requiring consent of the Owner, such consent not to be unreasonably withheld. Licensee further agrees not to sell any Tickets or any rights to admission to the Suite, the Parking Spaces or the Club or otherwise permit any person to occupy the same for hire, it being expressly understood that the use of Tickets, the Suite and the Club shall be solely and exclusively for the use, enjoyment and entertainment of Licensee, and officers, employees, visitors, guests and invitees of Licensee. Licensee agrees not to solicit or accept any direct or indirect payment or income from any person for the use and enjoyment of Tickets, the Suite, the Parking Spaces or the Club. The provisions of this Section 21 shall not prohibit Licensee from requiring its employees, guests and invitees, pursuant to Licensee's company or internal policy and procedure, to pay or reimburse Licensee for the use of Tickets.

21.2 <u>Consent</u>. If Licensee desires to assign its interest in this Agreement to any person, Licensee shall notify Owner in writing of such desire, setting forth the identity of the proposed assignee and the name, address and telephone number of the individual representing the proposed assignee so that Owner may communicate with the proposed assignee regarding the assignment. Owner shall have the right to contact the proposed assignee and conduct such investigation of the creditworthiness of such proposed assignee as Owner shall deem necessary, including requiring the proposed assignee to submit to Owner such financial and other information as Owner shall deem advisable. If Owner consents to the proposed assignment, it shall not be effective until Owner has received an instrument executed by the proposed assignee by which it agrees to be bound by this Agreement, and an instrument of assignment executed by Licensee satisfactory to Owner. Upon Owner's written consent to the assignment of this Agreement and receipt of such instruments, Licensee shall be released from any further obligations under this Agreement. Any consent by Owner to any assignment or other transfer by Licensee shall not be deemed to be a consent by Owner to any further assignment or other transfer by the successor Licensee. Any attempted assignment, sale, sublicense, transfer, mortgage or other alienation or encumbrance of this Agreement or any interest herein in contravention of Sections 20 and 21 hereof shall be null and void, and further shall constitute a default in the performance and observance of Licensee's duties and obligations under this Agreement.